**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 4KZ INCORPORATED, | |
| Plaintiff, | **MEMORANDUM AND ORDER** |
| -against- | Case No. 2:24-cv-01249-ST |
| DIMASHALI CREATIVE CENTER, LLP; KANAT AITBAYEV; and DINMUKHAMMED KUDAIBERGEN, | |
| Defendants. | |
| DIMASHALI CREATIVE CENTER, LLP and KANAT AITBAYEV, | |
| Counterclaim Plaintiffs, | |
| -against- | |
| 4KZ INCORPORATED, | |
| Counterclaim Defendant. | |
| DIMASHALI CREATIVE CENTER, LLP AND KANAT AITBAYEV, | |
| Third-Party Plaintiffs, | |
| -against- | |
| DAVID J. REYNOSO, (aka DAVID MORILLO, DAVID MIGUEL, DAVID VALERA,DAVID MIGUEL VALERA REYNOSO, and DAVID J. REYNOLDS, | |
| Third-Party Defendants. | |

**TISCIONE, United States Magistrate Judge:**

4KZ Incorporated ("4KZ") sued DimashAli Creative Center, LLP ("DimashAli"), Dinmukhammed Kudaibergen ("Kudaibergen"), and Kanat Aitbayev ("Aitbayev") alleging breach of contract, implied covenant of good faith and fair dealing, and intentional interference with contract. DimashAli and Aitbayev filed counterclaims against 4KZ and a third-party complaint against David Reynoso ("Reynoso" or "Valera") and Jason Bovell ("Bovell") alleging breach of

-1-

contract, copyright infringement, conversion, contribution, fraudulent inducement, and defamation[1]. Plaintiffs have since filed an amended counterclaim and third-party complaint. Defendants' initial complaint was dismissed for lack of prosecution, leaving only Plaintiffs' amended counterclaim and third-party complaint. Plaintiffs now seek default judgment against 4KZ and Reynoso. For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## BACKGROUND

### I.    PARTIES

Dinmukhammed Kudaibergen is a Kazakhstani citizen with an international singing career. Kanat Aitbayev is also a Kazakhstani citizen. Aitbayev is Kudaibergen's father and manager.

DimashAli Creative Center, LLP is a Kazakhstani limited liability partnership established to do business on Kudaibergen's behalf.

David Reynoso[2] is a New York citizen. 4KZ Incorporated is a business entity registered in New York. Reynoso is the CEO and President of 4KZ.

### II.    FACTUAL ALLEGATIONS[3]

In early 2020, David "Valera" approached Aitbayev through a mutual acquaintance in the Kazakh government to manage Kudaibergen. Am. Countercl. ¶ 100, ECF No. 16. Kudaibergen is a Kazakh recording artist with an established international singing career. *Id*. ¶ 11.

---

[1] Although 4KZ filed the initial complaint on this docket, Compl. ECF No. 1 ¶, all that remains is DimashAli and Aitbayev's counterclaims and third-party claims. Thus, for ease of comprehension this court shall refer to DimashAli and Aitbayev collectively as "Plaintiffs," and 4KZ and Reynoso collectively as "Defendants."

[2] David Reynoso operates under several aliases including David Morillo, David Miguel, David Valera, David Miguel Valera Reynoso, and David J. Reynolds. Am. Countercl. ¶ 89. This Court shall refer to him as David Reynoso.

[3] This Court takes the following factual allegations from Plaintiffs' First Amended Answer, Counterclaims, and Third Party-Complaint filed March 21, 2024, ECF No. 16, 18, as well as documents integral to the filing and upon which the filing relies (which Plaintiffs have since submitted to the Court in support of this motion). *See Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).

Valera purported to be a politically and professionally connected American consultant with access to the top 1% of American CEOs, Fortune 500 companies, and multibillion-dollar service sector firms. *Id.* ¶¶ 93-96. Valera also claimed to be a political scientist, economist, and diplomat. *Id*.

With Kudaibergen looking to emerge into the American market and Valera boasting industry contacts, the Parties entered an agreement where Valera would manage Kudaibergen for 10% commission. *Id.* ¶¶ 104-6. On April 15, 2020, 4KZ and DimashAli signed a contract to such effect. *Id*.

Valera, however, was not an industry renowned consultant. *Id.* ¶¶ 82-89. Valera's true identity is David Reynoso, a self-employed landscaper with substantial debt, almost zero assets, and a member of two Global Watch Lists, banning him from contracting with the U.S. Government. *Id*. Utilizing a web of lies, Reynoso solicited and misappropriated Plaintiff's money through fraudulent and coercive tactics. *Id.* ¶¶ 85-189.

In September 2020, Reynoso convinced Aitbayev to send him $60,000 to obtain U.S. visas for Aitbayev and Kudaibergen. *Id.* ¶ 21, 114-17. The purpose of the visas was to ease Plaintiffs' business-related entry into the U.S. *Id.* ¶ 114. Rather than provide an invoice, Reynoso requested Plaintiffs deliver $60,000 in cash to his assistant, in a sealed unmarked bag. *Id.* ¶¶ 119-21. The cash was delivered on September 4, 2020. *Id.* ¶ 120. Reynoso neither applied for nor obtained the visas. *Id.* ¶ 123. By September 15, a mere 11 days later, Reynoso had spent $26,000-$30,000 of Plaintiffs' money for unrelated purposes. *Id.* ¶ 121.

In October 2020, with COVID making live touring impossible, Plaintiffs produced a virtual concert. *Id.* ¶ 124. Reynoso convinced Plaintiffs to create an American corporation to handle revenue collection for the event. *Id.* ¶ 126. In November 2020, Aitbayev entered an agreement

with Jason Bovell, an accountant and associate of Reynoso, to create an American corporation and establish a bank account. *Id.* ¶ 127. On December 3, 2020, Bovell filed Articles of Incorporation in Georgia for DQ Music World, Inc. ("DQ"). *Id.* ¶ 128.

In December 2020, Reynoso requested broad power of attorney over Aitbayev to dispose of his property, enter contracts, and reimburse himself for expenses. *Id.* ¶ 131. Growing wary of Reynoso's motives, Aitbayev refused, instead granting Reynoso limited authority to register DimashAli's copyrights in the U.S. *Id.* ¶ 132.

DimashAli owned and operated a YouTube channel which generated revenue. *Id.* ¶¶ 180, 210. In December 2020, DimashAli authorized 4KZ to enter a two-year contract with Yoola Labs, Ltd. ("Yoola") to manage the channel. *Id.* ¶ 129, 182. On December 10, 2020, the agreement was executed. *Id.* The agreement provided that Yoola would manage DimashAli's YouTube channel and collect royalties. *Id.* ¶ 181. Yoola would deduct a 15% fee, transfer the royalties to 4KZ who would then distribute the remaining money to DimashAli, less 10% commission. *Id.* ¶ 181-82

In the agreement, however, 4KZ falsely guaranteed to exclusively own all rights to DimashAli's YouTube channel. *Id.* ¶ 130. During the first two years of the contract, royalties were paid to 4KZ then distributed to DimashAli. *Id.* ¶ 181-82. The agreement would automatically renew at the end of the two-year period unless either party chose to repudiate. *Id.* ¶ 173. DimashAli, a non-party to the agreement, lacked the ability to prevent renewal. *Id.*

In January and February 2021, Reynoso presented Bovell invoices for third-party services from two companies, Island Digital Media and Digital Solutions. *Id.* ¶¶ 134-36. Bovell paid the invoices from DQ's bank account without Aitbayev's knowledge or consent. *Id.* Evidently, these payments were made to 4KZ. *Id.*

In early 2021, Reynoso pitched Aitbayev on creating false employment contracts to obtain temporary work visas for Aitbayev and Kudaibergen. *Id*. ¶ 138. Aitbayev declined, as he had maintained a B1/B2 business/tourist visa since 2017. *Id*. ¶ 144. In August 2021, Kudaibergen, without Reynoso's assistance, obtained a B1/B2 business/tourist visa allowing him to enter the U.S. for business meetings and music recording. *Id*. ¶ 143.

In August 2021, with Reynoso having evidently failed to obtain permanent visas, Aitbayev demanded Reynoso return the $60,000. *Id*. ¶ 146. Reynoso refused and then accused Aitbayev and Kudaibergen of visa fraud. *Id*. ¶¶ 156-57. Reynoso repeated the visa fraud allegations to his assistant, Bovell, and a mutual friend in the Kazakh government. *Id*. ¶ 148.

On March 8, 2022, DimashAli requested Bovell relinquish DQ's remaining bank balance. *Id*. ¶ 153. Bovell refused, citing Reynoso's visa fraud allegations. *Id*. ¶ 154-55. Reynoso then told Plaintiffs that "no money will go out until you receive work visa because this is criminal." *Id*. ¶ 157.

Around this time, unbeknownst to Plaintiffs, Reynoso was in the throes of legal battles and surmounting debt. *Id*. ¶¶ 151, 158-61. On May 11, 2022, Reynoso filed for bankruptcy. *Id*. ¶ 158.

Throughout the summer and fall of 2022, DimashAli repeatedly demanded Bovell provide DQ's bank statements, which Bovell refused. *Id*. ¶ 163. On September 10, 2022, Reynoso wrote Bovell, again accusing Plaintiffs of visa fraud. *Id*. ¶ 164. The following day, Bovell informed Aitbayev he planned to dissolve DQ and relinquish its remaining $111,223.63 bank balance to Reynoso based on the visa fraud allegations. *Id*. ¶ 165. On September 19, 2022, Reynoso informed Aitbayev that Bovell had done so. *Id*. ¶ 171. Plaintiffs repeatedly attempted to get Reynoso to return their money to no avail. *Id*. ¶ 172.

Throughout this time, Defendants continued to receive royalties from DimashAli's YouTube channel. *Id.* ¶ 183. DimashAli, a non-party to the Yoola contract, was unable to terminate the agreement. *Id.* ¶ 173, 187. Defendants refused to relinquish control over the channel, instead lying to Yoola that ownership of the channel was being litigated. *Id.* ¶ 185. To be sure, YouTube representatives told Plaintiffs they could not remove Defendants' control over the channel until the non-existent litigation had resolved. *Id.* ¶ 187. From July 2023 – January 2024, 4KZ kept 100% of royalties, refusing to distribute to DimashAli altogether. ¶¶ 183-89. Finally, in January 2024, Yoola terminated the contract with 4KZ, and DimashAli regained control. *Id.* ¶ 189. This litigation commenced shortly thereafter.

### III.    PROCEDURLA HISTORY

In September 2023, DimashAli, Aitbayev, and DQ sued Reynoso on a separate docket for claims related to this action. *See DQ Music World v. Reynoso*, 2:23-cv-6581 (OEM) (ST). In January 2024, the suit was voluntarily dismissed to pursue settlement. *Id.* ¶ 80.

On February 17, 2024, 4KZ filed this action against Aitbayev, DimashAli, and Kudaibergen. *Id.* ¶ 81. On March 15, 2024, DimashAli and Aitbayev brought counterclaims against 4KZ and third-party claims against Reynoso and Bovell, alleging conversion, copyright infringement, fraudulent inducement, defamation, and breach of contract. Countercl., ECF No. 14. Plaintiffs filed an amended counterclaim and third-party complaint on March 21, 2024. *See* Am. Countercl.

On May 20, 2024, Defendants' Counsel filed a motion to withdraw for unpaid legal fees and a breakdown of the attorney-client relationship. *See* Mot. to Withdraw, ECF No. 33. This court granted that motion on July 15, 2024. *See* Minute Order, ECF No. 47.

Despite this court's repeated warnings, 4KZ failed to retain counsel and Default was entered on November 14, 2024. *See* Clerk's Entry of Default, ECF No. 48. This Court held a Show Cause Hearing on January 7, 2025, to hear Plaintiffs' Motion to Dismiss and Motion for Sanctions. *See* Minute Order, ECF No. 64. Defendants failed to appear, and the Motion for Sanctions was granted. *See* Minute Order, ECF No. 66. On February 21, 2025, default was entered against Reynoso. *See* Clerk's Entry of Default, ECF No. 72. On March 11, 2025, this Court dismissed 4KZ's claims for failure to prosecute leaving only the amended counterclaim and third-party complaint.

Plaintiffs now move for default judgment against 4KZ and Reynoso.

## LEGAL STANDARD

Obtaining a default judgment is a two-step process. *See* Fed. R. Civ. P. 55. Step one is to obtain an entry of default from the Clerk of Court. *See* Fed. R. Civ. P. 55(a). "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." *Id.* Here, 4KZ and Reynoso are in default.

Step two is to seek default judgment. *See* Fed. R. Civ. P. 55(b). "If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation," the clerk must, "on the plaintiff's request, with an affidavit showing the amount due . . . enter judgment for that amount and costs against a defendant . . . ." Fed. R. Civ. P. 55(b)(1). "In all other cases," a party must move for a default judgment before the court. Fed. R. Civ. P. 55(b)(2).

When a plaintiff moves for default judgment, the court must accept the complaint's well-pleaded factual allegations as true. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009); *see City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) ("a defendant who

defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint."). Here, the well-pleaded allegations are taken from Plaintiffs' First Amended Counterclaim and Third-Party complaint filed March 21, 2024. *See* Am. Countercl.

From there, the court must determine whether the facts alleged establish the defendant's liability as a matter of law. *Mickalis Pawn Shop*, 645 F.3d at 137. After all, "liability does not automatically attach from the well-pleaded allegations of the complaint, as it remains the court's responsibility to ensure that the factual allegations, accepted as true, provide a proper basis for liability and relief." *Rolls-Royce PLC v. Rolls-Royce USA, Inc.*, 688 F.Supp.2d 150, 153 (E.D.N.Y. 2010).

After determining liability, the court decides whether, and how much, to award in damages.  *Finkel*, 577 F.3d at 83 n.6 ("a default is not an admission of damages").  The court must "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999).  To show entitlement to damages, the movant must show that the "compensation sought relates to the damages that naturally flow from the injuries pleaded."  *Morales v. B&M Gen. Renovation Inc.*, 14-cv-7290 (MKB) (MDG), 2016 WL 1266624, at *2 (E.D.N.Y Mar. 9, 2016) (citations omitted), *report and recommendation adopted*, 2016 WL 1258482 (E.D.N.Y. Mar. 29, 2016). The court can determine damages without an evidentiary hearing  if "sufficiently  detailed affidavits and documentary evidence" support the request for damages.  *J & J Sports Prods., Inc. v. LX Food Grocery Inc.*, 15-cv-6505 (NGG), 2016 WL 6905946, at *2 (E.D.N.Y. Nov. 23, 2016).

## JURISDICTION & VENUE

### I.    SUBJECT MATTER JURISDICTION

Before granting a default judgment motion, "a court must first determine whether it has subject matter jurisdiction over the action." *Mt. Hawley Ins. Co. v. Pioneer Creek B LLC*, 20-cv-150, 2021 WL 4427016, at *3 (S.D.N.Y. Sept. 27, 2021). Here, this Court has subject matter jurisdiction because there is complete diversity between the parties and the amount in controversy exceed $75,000. 28 U.S.C. § 1332. Additionally, this court has federal question jurisdiction over Plaintiff's Copyright claim pursuant to 28 U.S.C. § 1338(a).

### II.    PERSONAL JURISDICTION

Before granting a motion for default judgment, a court may assure itself that it has personal jurisdiction over the defendant. *Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010). Here, 4KZ is New York corporation with its principal place of business is New York. Am. Countercl. ¶ 1. Likewise, Reynoso is New York resident. *Id*. ¶ 74. As such, this court has jurisdiction over Defendants. *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 622 n. 1, 627 (2d Cir. 2016).

## DISCUSSION

### I.    Liability

#### a.    Conversion of Cash

Plaintiffs bring two counts of conversion against Defendants, first, for the $60,000 in cash earmarked for visa applications, and second for 4KZ's misappropriation of YouTube royalites. Am. Countercl. ¶¶ 209-16, 232-39.

To establish a conversion claim, the movant must allege: (1) the property subject to conversion is identifiable; (2) the plaintiff has ownership over the property prior to conversion;

and (3) the defendant exercised unauthorized control over the property, altering the properties condition or impacting plaintiff's rights. *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004). Plaintiffs meet all requirements for the conversion of cash claim.

> Money may be the subject of conversion if it is specifically identifiable and there is an obligation to return it or treat it in a particular manner. When funds are provided for a particular purpose, the use of those funds for an unauthorized purpose constitutes conversion. Further, where possession of the property is initially lawful, conversion occurs when there is a refusal to return the property after a demand.

*Hoffman v. Unterberg*, 780 N.Y.S.2d 617, 619 (2004), *abrogated by Tzolis v. Wolff*, 884 N.E.2d 1005 (2008) (internal citations omitted). Here, the cash is specifically identifiable. Am. Countercl. ¶¶ 117-18. Further, Aitbayev gave the cash to Reynoso to obtain visas. *Id*. Reynoso never attempted to obtain the visas, let alone procure them. *Id*. ¶ 123. When it became apparent Reynoso failed to obtain visas, Aitbayev demanded return of the $60,000. *Id*. ¶ 146. Reynoso refused. *Id*. ¶ 147. Thus, although the initial possession of the cash was lawful, Reynoso's refusal to return constitutes conversion. *White v. City of Mount Vernon*, 633 N.Y.S.2d 369, 370 (1995). Plaintiffs are entitled to judgment for conversion of the cash.

### b.  Conversion of Royalties and Breach of Contract

Plaintiffs allege Defendants unlawfully withheld YouTube royalties constituting conversion. Am. Countercl. ¶¶ 209-13. Plaintiffs satisfy all three conversion elements, as the royalties are identifiable, Plaintiffs had ownership of the YouTube account, and Defendants exercised unauthorized control over the account. *Id*; *see Moses*, 360 F. Supp. 2d at 541 *supra*.

Additionally, Plaintiffs allege breach of contract. Plaintiffs' breach of contract theory, boiled down to its essence, is that Defendants violated the management agreement by retaining YouTube royalites from July – November 2023. Am. Countercl. ¶¶ 272-80. To establish breach of contract, a plaintiff must show: "(1) a contract exists; (2) plaintiff performed in accordance with

-10-

the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 409 (2d Cir. 2023) (citation omitted).

Here, Plaintiffs satisfy all elements: (1) there is a contract between the Parties. Am. Countercl. ¶ 53; Compl. ¶ 18; (2) Plaintiffs performed pursuant to the contract[4]. Pls.' Mem. of Law. at 20, ECF No. 74; (3) Defendants breached the contract.  Am. Countercl. ¶¶ 190-98; Mot. ¶¶ 19-23; and (4) Plaintiffs suffered damages. Am. Countercl. ¶ 196.

Evidently, both causes of action are predicated on the same factual allegations. Generally, when a contract exists, "a conversion claim may only proceed if there are allegations of violations and damages distinct from those predicated on a breach of contract." *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 164 (E.D.N.Y. 2012). Indeed, "[a]n otherwise properly pleaded conversion claim is susceptible to dismissal if it is duplicative of a breach of contract claim." *Nissan Motor Acceptance Corp. v. Nemet Motors, LLC*, No. 19CV3284NGGCLP, 2020 WL 4207533, at *2 (E.D.N.Y. July 22, 2020); *see also Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) (citation omitted) (conversion "claims are duplicative when both arise from the same facts and seek the identical damages for each alleged breach.").

Nevertheless, factually analogous conversion and breach of contract claims may coexist if Plaintiffs can either: "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentations and unrecoverable as

---

[4] Even though Plaintiffs did not include language in their complaint that they performed, "[i]t is not necessary for each factor to be pleaded individually." *Posner v. Minnesota Min. & Mfg. Co.*, 713 F. Supp. 562, 563 (E.D.N.Y. 1989); *see also ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243 (S.D.N.Y. 1997) ("[I]t is far from clear that a plaintiff is required to plead his or her own due performance.").

contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (internal citations omitted).

Plaintiffs rely on *Moses v. Martin* in an effort to maintain their conversion claim. 360 F. Supp. 2d 533. There, a celebrity hairstylist had an agent who was permitted to make appointments and collect payments. *Id*. at 538. The agent was obligated to disburse payments to the stylist less their 20% commission. *Id*. The agent, however, engaged in a scheme to withhold payments. *Id*. at 539. The stylist sued for conversion and breach of contract. *Id*. at 537. The Court ultimately upheld both causes of action, finding the conversion theory "distinct from any breach of contract claim." *Id*. at 542. In reaching their conclusion, the Court relied on *Bridgestone/Firestone, Inc.*, holding the agent had a "fiduciary obligation beyond the terms established by the agreement." *Id*. at 544. The scheme Defendants engaged in here is largely synonymous.

DimashAli and 4KZ entered an agreement wherein 4KZ was entitled to collect royalties, retain a 10% commission, and disburse the remaining funds. Am. Countercl. ¶ 106. 4KZ, however, failed to fulfill that obligation and withheld payments for five months *Id*. ¶ 192. Defendants were able to maintain control over the YouTube channel by falsely purporting to own its contents. *Id*. ¶ 130. Moreover, the very basis on which the Parties' agreement was founded is entirely fraudulent. As discussed *supra*, Reynoso lied about his identity, providing a fake name, fake credentials, and boasting a laundry list of sham contacts. *Id*. ¶¶ 85-93. Those actions may constitute fraud and a breach of fiduciary duty "separate from the duty to perform under the contract." *Bridgestone/Firestone, Inc.*, 98 F.3d at 20.

Nevertheless, the distinction between the breach of contract and conversion claim here is entirely academic as Plaintiffs "do not seek double recovery of the stolen royalties." Pls.' Mem. of Law at 16. This Court need not determine whether the causes of action are coterminous, as both

claims achieve the same result. Plaintiff is entitled to judgment for the full amount of royalties under breach of contract and conversion.

### c. Fraudulent Inducement

Next, Plaintiffs allege fraudulent inducement. The thrust of their argument is that Reynoso's myriad lies regarding his own identity, industry connections, and political influence persuaded Plaintiffs to enter the management agreement and give Reynoso $60,000. *Id.* ¶¶ 222-31.

Initially, this Court finds that Plaintiffs' fraudulent inducement claim can survive independent of their breach of contract claim. A party who is fraudulently induced to enter a contract may bring a fraud claim ancillary to breach of contract where the misrepresentations are "misstatements of material fact" as opposed to "mere[] promissory statements". *Shlang v. Bear's Ests. Dev. of Smallwood, N.Y., Inc.*, 194 A.D.2d 914, 915, (1993); *See also Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956, (1986). As demonstrated below, Reynoso made material misstatements – not mere promises to perform.

To establish fraudulent inducement, Plaintiffs must show: (1) a false representation of material fact; and (2) detrimental reliance. *Nader v. ABC Television, Inc.*, 150 F. App'x 54, 57 (2d Cir. 2005). Plaintiffs satisfy both elements.

First, Reynoso made numerous material misrepresentations. Reynoso created the fake persona, David Valera, a highly successful businessman with political connections and professional affluence. Am. Countercl. ¶¶ 85-93. Reynoso went as far as to claim he had connections to Donald Trump, Mike Pompeo, and Kamala Harris. *Id.* ¶¶ 112-13. This was, of course, untrue. Plaintiffs relied on these misrepresentations to their detriment by giving Reynoso

cash for visas and entering a management contract with 4KZ. As such, Plaintiffs are entitled to judgment for fraudulent inducement.

### d. Copyright Infringement

Copyright infringement is a violation of "any of the exclusive rights of the copyright owner." 17 U.S.C. § 501(a). Among those is the right "to distribute copies … of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. §106(3). "The owner of a copyright has the exclusive right to . . . reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (citing 17 U.S.C. § 106).

To establish a copyright infringement claim, a party must allege: (1) ownership of a valid copyright; and (2) copying of an original copyrighted work. *Boisson v. Banian, Ltd*, 273 F.3d 262, 267 (2d Cir. 2001).

The works at issue here are music videos on Plaintiffs' YouTube channel. Am. Countercl. ¶¶ 199-200. Specifically, Plaintiffs allege Defendants exercised unauthorized control over the YouTube channel, thus infringing on their copyrights. *Id*. ¶¶ 203-04. Plaintiffs claim the music videos constitute foreign works under 17 U.S.C. § 101. *Id*. ¶ 201. Generally, registration with the Copyright Office is "a precondition to filing a [copyright infringement] claim," *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010). Plaintiffs make the blanket assertion that "[o]nly United States works must be registered with the United States Copyright Office," and that foreign works "need not [be] registered with the Copyright Office in order for Plaintiffs to sue for infringement." Pls' Mem. of Law at 26. Such misstates the law.

"[T]he Copyright Act, as amended by the Berne Convention, extends certain protections to foreign pictorial, graphic, and literary works when the work is first published in the United

-14-

States or in a foreign nation that, on the date of first publication, is a treaty party." *Sadhu Singh Hamdad Tr. v. Ajit Newspaper Advert., Mktg. & Commc'ns, Inc.*, 503 F. Supp. 2d 577, 584 (E.D.N.Y. 2007) (citation omitted). Relevant here, "the Berne Convention does not require the owner of a foreign copyright to register in the United States before seeking redress for infringement of works *originating in foreign nations . . . that are signatories to that convention*." *Id.* at 584 (emphasis added). Thus, a foreign work may obviate the registration requirement if the country of origin is a member of the Berne convention.

Plaintiffs, however, fail to mention the country of origin of the subject music videos. Instead, Plaintiffs merely allege they own foreign works subject to copyright protection. Such is insufficient, as it fails to establish ownership of a valid copyright. *Boisson*, 273 F.3d at 267. Indeed, "[t]he question of whether or not a party has ownership of the copyright in the originating foreign nation is generally established by the laws of that nation." *Sadhu Singh Hamdad Tr.*, 503 F. Supp. 2d at 585. The paucity of facts alleged regarding the music videos' country of origin constrains this Court to deny plaintiffs' request for judgment as to copyright infringement.

### e.  Defamation Per Se

Finally, Plaintiffs allege defamation per se. A defamation claim in New York must include: (1) a written or spoken defamatory statement; (2) publication to a third party; (3) fault of the defendant; 4) falsity of the statement; and 5) *per se* actionability. *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).

Plaintiff's claim Reynoso told Bovell and others that Aitbayev and Kudaibergen engaged in visa fraud, constituting defamation *per se*. Am. Countercl. ¶¶ 240-45. For example, on September 10, 2022, Reynoso emailed Bovell stating Aitbayev and Kudaibergen filed paperwork with the Department of Homeland Security under false pretenses, in an effort to commit visa fraud.

*Id.* ¶ 164. Reynoso claimed Aitbayev and Kudaibergen failed to inform U.S. officials they were doing business in the U.S when they applied for their visas. *Id.* These allegations are false. Aitbayev held a B1/B2 visa since 2017. *Id.* ¶ 144. Likewise, Kudaibergen obtained a visa that allowed him to enter the U.S. for business purposes, provided he did not receive income from a U.S. source while here. *Id.* ¶ 143. It is well established that "[i]mputing criminal behavior to an individual is generally considered defamatory Per se, and actionable without proof of special damages." *Paul v. Davis*, 424 U.S. 693, 697 (1976).

As such, Plaintiffs are entitled to judgment for defamation *per se*.

## II.    Piercing the Corporate Veil

As a final point on liability, this Court must decide whether to pierce the corporate veil and hold Reynoso liable in his individual capacity for 4KZ's actions. Additionally, New York law permits "reverse" veil piercing, that is to hold a corporation liable for an individual's actions. *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).

Courts are permitted to pierce the veil on a default judgment. *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 342 (2d Cir. 1986). To do so, Plaintiffs must demonstrate a lack of corporate formalities such that the corporation was used as an alter ego, and that the corporation was used to perpetuate fraud. *Atateks Foreign Trade, Ltd. v. Priv. Label Sourcing, LLC*, 402 F. App'x 623, 626 (2d Cir. 2010); *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991). Here, Plaintiffs sufficiently plead both elements.

As to the first prong, Plaintiffs claim "Reynoso is 4KZ's sole shareholder, pays its taxes as part of his personal income tax, commingles its money with his own, and treats it as his alter ego." Am. Countercl. ¶¶ 197, 207, 215. As made clear by the Second Circuit, utilizing a corporation for personal business is sufficient evidence of an alter ego. *Wm. Passalacqua Builders, Inc.*, 933 F.2d

at 138. To be sure, a Court may disregard corporate form in the absence of fraud where, as here, there is evidence of excessive individual control. *Id*. at 141. This Court, however, need not make such a determination as Defendants have undoubtably engaged in fraud.

Reynoso fraudulently induced Plaintiffs to sign a management contract and entrust him with $60,000. Am. Countercl. ¶¶ 222-31. Moreover, Reynoso provided a fake name and fake credentials throughout the Parties' business relationship. *Id*. ¶¶ 85-93. As belabored at this point, Defendants' conduct was entirely fraudulent. As such, this Court will pierce the corporate veil. Both Reynos and 4KZ are jointly and severally liable for all damages set forth below.

### III.    Damages

Since liability has been established, this Court must now ascertain damages with "reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999). To prove damages, the movant need only show that the "compensation sought relate[s] to the damages that naturally flow from the injuries pleaded." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992). An evidentiary hearing is not required so long as there is a basis, demonstrated through detailed affidavits and other documentary evidence, for the damages awarded. *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997) (internal citations and quotations omitted); *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991).

Plaintiffs seek $519,813.60 for compensatory, punitive, and statutory damages, including prejudgment interest. Plaintiffs have provided detailed affidavits and documentary evidence to support these claims. *See* Mot. For Sanctions ECF No. 51.

### a. Conversion of Cash

In New York, "[t]he usual measure of damages for conversion is the value of the property at the time and place of conversion, plus interest." *Scotti v. Barrett*, 166 A.D.3d 698, 699, 88 N.Y.S.3d 44, 45 (2018). For conversion claims, "New York law mandates prejudgment interest at 9% per annum." *BPP Wealth, Inc. v. Weiser Cap. Mgmt., LLC*, 623 F. App'x 7, 10 (2d Cir. 2015) (citing N.Y. C.P.L.R. §§ 5001(a); 5004). When calculating interest, it "shall be computed from the earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. § 5001(b).

Here, the cause of action accrued on September 4, 2020. Am. Countercl. ¶ 121. As such, Plaintiffs are entitled to $60,000 in compensatory damages plus prejudgment interest at 9% per annum for 61 months. Such is broken down as follows:

| Amount Converted | Number of Months | Interest @ 9% Per Annum | Total Damages |
|---|---|---|---|
| $60,000 | 61 | $27,450.00 | $87,450.00 |

Plaintiffs also seek to recover $60,000 under a fraudulent inducement theory. Although Defendants are liable for both causes of action, Plaintiffs are not entitled to double recovery as both claims seek to redress the same harm. *See NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (citation omitted) ("Two claims are duplicative of one another if they arise from the same facts ... and do not allege distinct damages."). As such, this Court will not engage in a duplicative damages analysis.

### b. Conversion of Royalties and Breach of Contract

As to conversion of the royalty payments and breach of contract, Plaintiffs seek $37,751.59 plus prejudgment interest. The $37,751.59 figure represents the royalties generated by Plaintiffs' YouTube account from July – November 2023. Plaintiffs demonstrate the amount to reasonable

certainty through affidavits and exhibits, including a chart showing the breakdown of royalty payments by month. As such, this Court is satisfied as to Plaintiffs' damages request.

Again, Plaintiffs are entitled to prejudgment interest at 9% per annum from the date of the cause of action. N.Y. C.P.L.R. §§ 5001(a-b); 5004. However, like here, when damages are "incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." N.Y. C.P.L.R. §5001(b). Indeed, courts have "wide discretion in determining a reasonable date from which to award pre-judgment interest." *Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir. 1994). Many Courts under like circumstances have calculated interest from a reasonable mid-point. *See Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 93 (E.D.N.Y. 2012); *Ying Ying Dai v. ABNS NY Inc.*, 490 F. Supp. 3d 645, 662 (E.D.N.Y. 2020); *Sanchez v. Ms. Wine Shop Inc.*, 643 F. Supp. 3d 355, 380 (E.D.N.Y. 2022).

The reasonable midpoint here is September 2023. As such, Plaintiffs are entitled to $37,751.59 in compensatory damages, plus prejudgment interest at 9% per annum for 23 months. Such is broken down as follows:

| Amount Converted | Number of Months | Interest @ 9% Per Annum | Total Damages |
|---|---|---|---|
| $37,751.59 | 23 | $6,512.14 | $44,263.74 |

### c. Defamation Per Se

Recovery for defamation typically requires proof of special damages which are "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." *Celle*, 209 F.3d at 179 (quotation omitted). However, "[i]f a statement is defamatory per se, injury is assumed." *Id*.

Here, Bovell transferred the $111,223.63 bank balance to Reynoso because of the visa fraud allegations. This constitutes special damages, as it flows directly from Reynoso's defamatory statements. Alternatively, Plaintiffs are entitled to damages absent proof based on the *per se* nature of the statements. *Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 165 (E.D.N.Y. 2014). Plaintiffs concede that the $111,223.63 is "an appropriate measure of damages" for defamation per se. Pls.' Mem. of Law at 39. Thus, the award amount is the same under either theory of recovery.

Plaintiffs are entitled to $111,223.63 plus prejudgment interest at 9% per annum since September 2022 – the date Bovell transferred the bank balance to Reynoso. Such can be broken down as follows:

| Damages | Number of Months | Interest @ 9% Per Annum | Total Damages |
|---------|------------------|-------------------------|---------------|
| $111,223.63 | 36 | $30,030.38 | $141,254.01 |

### d.  Punitive Damages

The purpose of punitive "is not to remedy private wrongs but to vindicate public rights." *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 N.Y.2d 603, 613 (1994). New York law limits the availability of punitive damages for claims that arise from a contractual relationship. *Id*. Like here, "[w]here a lawsuit has its genesis in the contractual relationship between the parties, the threshold task for a court considering . . . punitive damages is to identify a tort independent of the contract." *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995). Thus, a party "may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations." *Id*. at 316.

At the outset, Plaintiffs' claims arising from the Parties' contractual relationship – breach of contract, conversion of cash, conversion of royalties, and fraudulent inducement – are not

subject to punitive damages. New York law is clear that punitive damages are only available for tortious conduct related to a contractual relationship in rare circumstances. A plaintiff must not only prove that the tortious conduct was sufficiently egregious, "but also that such conduct was part of a *pattern of similar conduct directed at the public generally.*" *U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996) (emphasis in original); *see also Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961). Here, while Reynoso's conduct may have been egregious, Plaintiffs fail to establish it was aimed at the public generally.

Next, we must analyze Defendants' tortious conduct independent of the Parties' contractual relationship – i.e. – defamation. This Court has little hesitancy holding the defamation occurred outside the contractual relationship. However, Plaintiffs fail to establish entitlement to punitive damages. Plaintiffs allege Reynoso made defamatory statements "with actual malice in that he made them with knowledge that they were false or with reckless disregard as to their truth or falsity." Am. Countercl. ¶ 242. Relevant here, "[p]unitive damages may only be assessed under New York law if the plaintiff has established *common law malice*[.]" *Celle*, 209 at 184 (emphasis added). The distinction between common law malice and actual malice is material, as actual malice "is insufficient by itself to justify an award of punitive damages, because that malice focuses on the defendant's state of mind in relation to the truth or falsity of the published information." *Prozeralik v. Cap. Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479 (1993). To be sure, actual malice "does not measure up to the level of outrage or malice underlying the public policy which would allow an award of punitive damages." *Id.*

In sum, Plaintiffs are not entitled to punitive damages.

###### e.  Post-Judgment Interest

Pursuant to 28 U.S.C. § 1961(a) "[t]he award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered." *Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996). Accordingly, Plaintiffs are entitled to post-judgment interest to be calculated from the date the Clerk of Court enters judgment in this action until the date of payment at the statutory rate.

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion is GRANTED in part and DENIED in part. Judgment is entered against 4KZ, Inc. and David Reynoso in favor of Plaintiffs in the amount of $208,975.22 plus pre- and post-judgment interest. 4KZ, Inc. and David Reynoso are jointly and severally liable.

**SO ORDERED**

/s/_____
Steven L. Tiscione
United States Magistrate Judge
Eastern District of New York

Dated: Central Islip, New York
      September 22, 2025